UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

WENDELL PAYNE; CHRIS RIDDLE;
XCURSION MARKETING GROUP,
L.L.C.,
       Plaintiffs,  CIVIL ACTION

          No. 3:13-cv-00679-JWD-RLB
VERSUS


FOREST RIVER, INC.
       Defendant.


**ORDER ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**


**I.**  **INTRODUCTION**

  Before the Court is the Motion for Partial Summary Judgment ("Partial MSJ"), filed by

Forest River, Inc. ("Defendant" or "Forest River"), asking this Court to dismiss the claims for

breach of contract, claims predicated on the existence of a joint venture under Louisiana law,

advanced by Mr. Wendell Payne ("Payne") and Mr. Chris Riddle ("Riddle") ("Individual

Plaintiffs") as well as Xcursion Marketing Group, L.L.C. ("Xcursion Marketing") (collectively,

"Plaintiffs"), the company founded by Payne and Riddle in 2011, pursuant to Federal Rule of

Civil Procedure 56.[1] Defendant's substantive arguments appear in the Memorandum in Support

of Motion for Partial Summary Judgment ("Supporting Memorandum"), (Doc. 55-4), and the

Reply Memorandum in Support of Motion for Partial Summary Judgment ("Reply

Memorandum"), (Doc. 65). Plaintiffs' arguments are put forth in the Plaintiffs' Memorandum in

---

[1] Any and all references to "Rule" or "Rules" in this order are to the Federal Rules of Civil
Procedure unless otherwise noted.

Opposition to Defendant's Partial Motion for Summary Judgment ("Opposition"), (Doc. 59), and

Plaintiffs' Sur-Reply in Opposition to Defendant's Partial Motion for Summary Judgment ("Sur-

Reply"), (Doc. 68). For the reasons more fully set forth below, the Court determines that

Defendant has not satisfied the requirements erected by Rule 56. As such, it DENIES

Defendant's Partial MSJ.


## II.   FACTUAL & PROCEDURAL BACKGROUND

### A.   Uncontested Facts

Officially incorporated on November 27, 1995, as an Indiana entity but a wholly owned

subsidiary of Berkshire Hathaway, Inc., since September 2005, (*see, e.g.*, Doc. 1 ¶ 4(d) at 32;

Doc. 2), Defendant's multiple divisions manufacture numerous types of recreational and

commercial vehicles under a variety of brands, (*See, e.g.*, Doc. 59 at 10). One such division is

"Forest River Marine, Inc."; its president and general manager is Mr. Thomas Ray McCuddy

("McCuddy"). (Doc. 55-3 ¶ 2 at 1; Doc. 1-2 at 45.) One such brand of boats is "Xcursion

Pontoons" ("Xcursion"). FOREST RIVER, INC., http://www.forestriverinc.com/#&panel1-3 (last

visited on Nov. 10, 2015). Formally founded on February 11, 2011, by Riddle and Payne,

Xcursion Marketing is a Louisiana limited liability corporation domiciled at 11314 Sheets Road,

Gonzalez, Louisiana, which filed its last required report on March 25, 2013. (*See* Doc. 1-1 ¶ 2 at

1; Doc. 59 at 3.) Since February 2011, Payne has served as its registered agent, and the

Individual Plaintiffs have been its only two officers.

In January 2011, the Individual Plaintiffs devised the design for the Xcursion line. (Doc.

1-1 ¶ 2 at 1; *see also* Doc. 11 at 1; Doc. 59 at 19; Doc. 59-2 at 20.) Having thereafter

"perfect[ed]" their blueprint, the Individual Plaintiffs met with Forest River's McCuddy in

Middlebury, Indiana, either by telephone or in person. (Doc. 1-1 ¶ 3 at 1; *see also* Doc. 11 at 1.) Soon afterward, in Ascension Parish, Louisiana, Defendant and Plaintiffs finalized their "verbal" contract. (Doc. 1-1 ¶ 4 at 1–2; *see also, e.g.*, Doc. 11 at 1; Doc. 55-3 ¶ 5 at 1; Doc. 55-4 at 3.) By choice,[2] the Parties never reduced any contractual provision to writing. (*See, e.g.*, Doc. 55-3 ¶¶ 6–7 at 2; Doc. 55-4 at 9–11, 14; Doc. 59 at 3.)

Still, this agreement's outline is clear: while Forest River acquired the rights to Xcursion, the Individual Plaintiffs were obligated to market Xcursion and entitled to four percent (4%) of the total sales of Xcursion pontoons. (Doc. 1-1 ¶ 4 at 1–2; *see also* Doc. 11 at 1.) With this arrangement set, the manufacturing and the marketing of the Xcursion boats commenced in May 2011. (Doc. 1-1 ¶ 5 at 2; *see also, e.g.*, Doc. 11 at 2; Doc. 18-1 at 2; Doc. 55-3 ¶ 9 at 2; Doc. 55-4 at 4; Doc. 59-2 at 39.) Per a series of checks endorsed by Forest River and paid to the order of Xcursion Marketing, the latter's commission of 4% netted Riddle and Payne a total payment of $8,881.24 for July 2011, $19,772 for August 2011, $18,892 for September 2011, $41,804.72 for October 2011, $40,249.60 for November 2011, $21,349.92 for December 2011, $36,512.08 for January 2012, $35,215.24 for February 2012, $51,748.98 for March 2012, $80,105.84 for April 2012, $96,620.24 for May 2012, $106,518.64 for June 2012, and $84,793.56 for July 2012. (Doc. 1-2 at 12, 14, 16, 18, 20, 22, 29, 31; *see also* Doc. 55-4 at 5.) During these months, on at least one occasion, Defendant publicly described Harry Riddle, Riddle's father, (Doc. 59-2 at 89), as its "representative" for Texas, Arkansas, Oklahoma, and New Mexico. (Doc. 1-2 at 38.) This same publication held out Riddle as both the "Vice President" of "Xcursion Pontoons" and the "Vice President of Sales" for Forest River. (*Id.* at 38, 45.)

---

[2] The Parties blame each other for this peculiarity. (Doc. 55-4 at 10 n.33; Doc. 59 at 5.)

In the summer of 2012, citing the Xcursion line's unprofitability, Forest River attempted to renegotiate the Individual Plaintiffs' four percent commission to some lower value more consistent with its prior practice.[3] (Doc. 1-1 ¶¶ 8–9 at 2; *see also, e.g.*, Doc. 55-3 ¶ 11 at 3; Doc. 55-4 at 4.) Acrimony followed.[4] (Doc. 1-1 ¶ 10 at 2; *see also* Doc. 11 at 2.) The Parties met in July 2012 in Middlebury, Indiana, in an attempt to dissolve this rancor. (Doc. 55-4 at 12.) Upon these negotiations' failure, Defendant terminated the contract in August 2012 and sent off a final check. (Doc. 1-1 ¶ 11 at 2–3; *see also* Doc. 55-3 ¶ 10 at 2; Doc. 55-4 at 2–3, 12–13.) Through November 7, 2015, moreover, Defendant has continued to sell Xcursion. FOREST RIVER MARINE, INC., http://www.xcursionpontoon.com (last visited on Nov. 10, 2015).

### B.    Contested Factual Issues

Although the Parties agree on the foregoing, Plaintiffs and Defendant disagree on two other issues. (*See, e.g.*, Doc. 11 at 4–5; Doc. 55-4 at 1.)

First, the kind of legal relationship brought about by the Parties' verbal contract is contested. In Plaintiffs' view, the Parties established "a joint venture," a special type of quasi-partnership arrangement well-mined by a multitude of Louisiana courts. (Doc. 1-1 ¶ 4 at 1–2, ¶ 7 at 2; *see also* Doc. 11 at 3.) Conversely, Defendant refuses to characterize the Parties' relationship in these precise terms. (Doc. 14 at 4, ¶ 21 at 5; *see also* Doc. 55-3 ¶ 8 at 2.) Instead, Defendant describes the underlying contract as no more than "a sales commission agreement." (Doc. 55-3 ¶ 4 at 1, ¶ 10 at 2; *see also, e.g.*, Doc. 65 at 2, 4.)

---

[3] Plaintiffs have produced a chart outlining the outstanding payments at the original rate of 4% and the proposed rates of 1% and .75%. (Doc. 1-2 at 37.)

[4] Allegedly, Defendant thereafter engaged in actions forbidden under Louisiana's Unfair Trade Practices Act. (Doc. 1-1 ¶ 10 at 2, ¶ 15 at 3; *see also* Doc. 11 at 2.) As the present motion does not focus upon these particular allegations, (Doc. 55-4 at 1 n.1), this opinion will not delve into the factual allegations relevant to this cause of action.

Second, the financial health of the Xcursion line is disputed. According to Plaintiffs, "Xcursion became an enormous success," "yield[ing] approximately $20,000,000 in gross sales" in its first year. (Doc. 1-1 ¶ 6 at 2.) By their reckoning, "[f]or the period of January 1, 2012 – December 31, 2012, Forest River slated itself to manufacture 900 boats at an approximate cost of $21,500.00 each." (*Id.* ¶ 7 at 2.) These sales "brought in substantial profits for [D]efendant," which is "in the process of attempting to sell the Xcursion line because of its profitability and success." (*Id.* ¶ 13 at 3.) In contrast, Defendant contends that "[b]etween April 2011 and April 2013, the business operations related [to the] . . . production, sale, and marketing of Xcursion pontoon boats operated at a net loss" in excess of $1,400,000. (Doc. 14 ¶¶ 19–20 at 5; *see also* Doc. 1-1 ¶ 13 at 3.) In particular, according to McCuddy, the Xcursion line has "lost a considerable amount of money" and possessed no more than the potential to "become a marginally profitable product line in 2013/2014." (Doc. 1-1 ¶ 13 at 3; *see also* Doc. 14 ¶¶ 22–23 at 5; Doc. 55-4 at 5.)

## C.   Procedural History

On April 11, 2013, Plaintiffs filed a complaint in the Twenty-Third Judicial District Court, located in the Parish of Ascension, of the State of Louisiana. (Doc. 1-2 at 6.) In October of 2013, Defendant sought to remove that action to this Court. (Doc. 1 at 1.) While Plaintiffs opposed removal, (Doc. 4), this Court allowed it on March 20, 2014. (Doc. 8.) As authorized by order, (Doc. 13), in response to Defendant's motion for leave to file an amended answer, (Doc. 10), the Amended and Restated Answer with Counter Claim by Forest River was tendered on May 21, 2014, (Doc. 14). Plaintiffs filed the Answer to Counter Claim Filed by Forest River on July 15, 2014. (Doc. 17.) After a flurry of discovery-related motions and orders, Defendant

submitted the Partial MSJ on May 22, 2015. (Doc. 55.) Having received an extension, (Doc. 57), the Plaintiffs delivered the Opposition on June 22, 2015, (Doc. 59). The Reply Memorandum arrived fourteen days later. (Doc. 65.) Plaintiffs' Sur Reply was docketed on July 9, 2015. (Doc. 68.)

### D.   Parties' Arguments

#### 1.   Defendant's Position

Defendant makes two distinct arguments to support its ultimate conclusion: "The [P]laintiffs are not entitled to any additional commissions (or other amounts) based on the sales contract or any other agreement." (Doc. 55-4 at 2.)

The first line of reasoning is grounded in Article 2024 of the Louisiana Civil Code:[5] "[B]ecause the sales contract had unspecified duration, it could be terminated by either party, with proper notice." (Doc. 55-4 at 2.) The Parties' contract, Defendant explains, falls into this Article's definition of an accord of "an unspecific duration," for "the term[s] of the agreement" remain "uncertain and undeterminable based on the intent of the [P]arties or the circumstances related to the contract." (Doc. 55-4 at 9 (citing *Schultz v. Hill*, 840 So. 2d 641, 644–45 (La. Ct. App. 2003)).) Plaintiffs may have thought the agreement would be "perpetual," but "have no factual or legal basis to show that the [P]arties reached this agreement"; furthermore, this "subjective" belief was "never" communicated to Forest River. (Doc. 55-4 at 9, 10; *see also* Doc. 65 at 2–3.) So far, Plaintiffs have "not provided any evidence to meet . . . [their] burden" of proving "the [P]arties reached an agreement as to the ['perpetual'] term" but their own "conclusory statements about what . . . [they] apparently believed." (Doc. 55-4 at 13 n.40, 9–10;

---

[5] In this opinion, any and all references to "Article" are to a subdivision of the Louisiana Civil Code.

*see also* Doc. 65 at 2 & n.3, 3–4.) In sum, "the [P]aintiffs have not identified a single piece of evidence that the [P]arties agreed that the commission agreement would have a perpetual term or any evidence that shows a genuine factual dispute about the duration of the agreement." (Doc. 65 at 4 (emphasis in original).) Accordingly, the Parties' "sales commission agreement" is subject to Article 2024, and as Defendant gave "prompt notice" of their intent in July 2012 and paid all commissions owed through that summer month, "Forest River does not owe any additional commissions."[6] (Doc. 55-4 at 2, 12–13; *see also* Doc. 65 at 3, 4.)

In this discussion, Defendant relies heavily on a case and an affidavit. First, for guidance regarding the meaning of Article 2024, Defendant points this Court to a recent "similar" decision by the Supreme Court of Louisiana in which a plaintiff's failure to offer "any objective evidence" to support a "subjective belief" regarding his employment contract's duration deprived the contract of the "definite term" typically required by Louisiana law. (Doc. 65 at 2–3 (citing *Read v. Willwoods Cmty.*, 165 So. 3d 883 (La. 2015) ("*Read*")).) Second, Defendant stresses two averments in the a declaration tendered and sworn by McCuddy ("McCuddy Declaration"): (1) "in his recollection," Forest River Marine Division "has never . . . entered into a sales commission agreement related to marine products with a term longer than one year," and (2) again in his memory, "Forest River has never entered into a sales commission agreement that would last as long as a marine product line was manufactured." (Doc. 55-4 at 11; *see also* Doc. 65 at 3–4.)

Although it is partly subsumed into the first—Defendant's position regarding the contract's termination explicitly assumes the Parties' agreement was a "sales contract" or a "sales commission agreement," (Doc. 55-4 at 2, 11; *see also* Doc. 65 at 2, 4)—Defendant's

---

[6] Defendant provides different dates for this pivotal meeting: August 2012, (Doc. 65 at 3 n.7), and July 2012, (Doc. 55-4 at 2).

second argument is a wholesale denial of the existence of a joint venture, (Doc. 55-4 at 2). For Defendant, no such arrangement could have arisen because the Parties "had no written joint venture agreement" and the Parties did not agree to share in profits or in losses pursuant to "a[ny] specific agreement."[7] (*Id.* at 2.) For a definition of a "joint venture," Defendants cite an old edition of the preeminent legal dictionary, (*id.* at 14 & nn. 42–43 (citing BLACK'S LAW DICTIONARY (7th ed. 2000)), and deem dispositive three "facts"; (1) "no . . . documents" exchanged by the Parties used the term "joint venture"; (2) the Parties "did not agree to share expenses"; and (3) the Parties also did not agree to share "losses" or "expenses" that "related to . . . [this] alleged joint venture," (*Id.* at 14–15). This last assertion plays a most pivotal role in this argument, as "[o]ne of the key elements of . . . [a] joint venture is that 'the parties agree to share losses'." (*Id.* at 14–15 (citing *Latiolis v. BFI of La., Inc.*, 567 So. 2d 1159, 1161–62 (La. Ct. App. 1990)).) "Louisiana courts," Defendant contends, "have made clear that a joint venture must include an agreement to share losses and expenses" as well as "profits," so that Plaintiffs' "flat[]" denial that such an exact agreement existed must be fatal to their present posture. (*Id.* at 16, 17.) This assertion is echoed in the Reply Memorandum: "[P]laintiffs have not offered evidence to show that the alleged joint venture amounted to a separate juridical entity or that the parties reached an agreement as to the sharing of losses [and 'profits']of the alleged joint venture." (Doc. 65 at 4–5.) Without these "critical elements," as well as unspecified "others that are missing," no joint venture can have arisen. (*Id.* at 5; *see also* Doc. 55-4 at 13.)

---

[7] Indeed, Defendant describes Plaintiffs' joint venture theory as "vague[]," their complaint "not mak[ing] clear whether this allegation is related to their breach of contract claims or is another theory of recovery." (Doc. 55-4 at 13.) As shown below, *see infra* Part III.A.2, a rich, if elusive, body of law exists regarding these juridical persons.

2.      *Plaintiffs' Side*

In every relevant filing, Plaintiffs maintain their central claim: "The agreement [between Plaintiffs and Defendant] was that of a joint venture/partnership." (Doc. 59 at 3; *cf.* Doc. 68 at 2–3.) Conceding that the contract was "not in writing" but emphasizing the irrelevance of that fact to the engenderment and legal recognition of a joint venture, Plaintiffs cite to various snippets of Riddle's testimony as evidence of such a partnership. (Doc. 59 at 3, 5; *see also* Doc. 68 at 2–3.) In recounting his purported discussion with McCuddy, Riddle said, "I'm tired of getting screwed over as a rep" and "want to do my own thing"; McCuddy allegedly responded, "Control your own destiny," and "[L]et's do it together." (Doc. 59 at 3, 7; *see also* Doc. 68 at 2.) McCuddy additionally referred to the Parties' contract as "a partnership," "venture," "marriage," "joint combined effort," and "team effort." (Doc. 59 at 3, 7, 16, 19, 20; *see also* Doc. 68 at 2–3.) To at least one named third party (and unspecified others), moreover, McCuddy allegedly referred to having "partnered" with Riddle. (Doc. 59 at 3, 7, 16; *see also* Doc. 68 at 2.) On such portions of their own testimony and McCuddy's deposition do Plaintiffs mostly rely.

Plaintiffs, however, do more, insisting: "[T]here is ample evidence that . . . [the Parties] did much more than just sell the new line." (Doc. 59 at 7.) Thus, the Parties "collaborated with Forest River on plans, drawing, colors, component parts, and design" and together "came up with the dealer program regarding discounts and specials, purchased websites, and created marketing material." (*Id.* at 7, 16; *cf.* Doc. 68 at 2.) In addition, Payne and Riddle, whether or not in under the guise of Xcursion Marketing, "were asked to approve design decision by Forest River Engineering"; this latter contention is buttressed by a series of emails. (Doc. 59 at 7 & n.25, 16–17.) Within this argument, Plaintiffs emphasize the fact that Defendant paid Xcursion, not Riddle, (Doc. 59 at 4; *see also* Doc. 1-2 at 12, 14, 16, 18, 20, 22, 29, 31), an allegation whose

import—that Xcursion was a separate entity from both Riddle and Defendant—Defendant brands "absurd,"[8] (Doc. 65 at 4 n.8). Plaintiffs argue  that "ample" evidence, "circumstantial" and otherwise, demonstrates more than an agency relationship between Defendant and Plaintiffs, with Louisiana law requiring no "express or written contract" and setting "no hard and fast rules in making the determination of whether a partnership exists." (Doc. 59 at 12–13, 15–22; *see also* Doc. 68 at 2.)

In the Opposition, Plaintiffs also analyze the seven factors relevant for the finding of a joint venture specified in Article 2801 and case law, *see infra* Part III.A.2. (Doc. 59 at 14, 15–22.) In the course of this discussion, they specifically question Defendant's assertion that an agreement regarding losses was necessary. (*Id.* at 20.) Instead, "Plaintiffs risked loss in the form of expenditure and out-of-pocket expenses in providing services to the joint venture," and such a split burden can often satisfy the law's prerequisites. (*Id.* at 20–21.) They describe Defendant's interpretation of another element—"a sharing of profits"—as "too simplistic, narrow, and misleading." (*Id.* at 21.) True, Plaintiffs "never made a demand for a share of 'profits.'" (*Id.*) Nonetheless, this purported "joint venture [did] involve[] a sharing of gross sales"; additionally, "joint ventures can be formed for other specific purposes," making the dearth of any unambiguous profit-sharing accord arguably relevant but never controlling. (*Id.*) Here, because "Plaintiffs clearly had an interest in ensuring that the venture operated profitably," this holistically construed element is arguably evidenced by the existing record. (*Id.*; *see also* Doc. 68 at 3–4.)

---

[8] Defendant's allegation is partly based on the incorrect belief that Xcursion was formed before the agreement was reached, itself the apparent product of a misreading of the complaint. (Doc. 1-1 ¶¶ 1–4 at 1–2.) Xcursion was incorporated after the Parties' first colloquy, while the "juridical person" allegedly engendered by the Parties' joint venture was neither Xcursion nor Forest River but rather a combination of four persons—Riddle, Payne, Forest River, and Xcursion—directed towards a specified end.

Concurrently, Plaintiffs address Defendant's argument regarding the import of their contract's indefinite duration. To them, "[t]he law and the evidence . . . support the finding that genuine issues of material fact exist as to whether the duration of the contract was determinable and/or contingent upon an ascertainable event." (Doc. 59 at 8; *see also* Doc. 68 at 2.) Instead of being indeterminate, Plaintiffs see the Parties' oral contract as subject to "a resolutory condition," defined as "an obligation that . . . may be immediately enforced but will come to an end when an uncertain event occurs," unconstrained by the technical formalities ordained by Article 2024. (Doc. 59 at 10–11 (citing Article 1768); *see also* Doc. 68 at 2.) McCuddy himself seemingly thought the Parties' deal would "be a longer term situation than 'year-to-year,'" his own admission underscoring the irrelevance of Defendant's pattern of yearly negotiations with its coterie of salespersons. (Doc. 59 at 10; *see also* Doc. 68 at 2–3.)

Finally, Plaintiffs question the relevance of *Read*. (Doc. 68.) First, they seek to distinguish *Read* procedurally: "*Read* was not decided on a motion for summary judgment." (*Id.* at 1.) Second, the Plaintiff in *Read* had no other corroborating" evidence at the conclusion of a full trial; Here, there has been no trial. (*Id.* at 1–2.) Third, unlike *Read*, the "instant case does not involve an employment contract," in which "the presumption [is] that employment is at will." (*Id.*)

## III.   DISCUSSION

### A.    Applicable Law

### 1.    *Standard under Rule 56*

Rule 56 encodes the standard applicable to Defendant's Partial MSJ. Per Rule 56(a), summary judgment is appropriate "if the movant shows there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a);

*Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (quoting Rule 56(a)). A dispute is "genuine"

so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party"; a fact is "material" if it "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202

(1986); *see also Ray v. United Parcel Serv.*, 587 F. App'x 182, 186 (5th Cir. 2014) (citing *id.*).

Axiomatically, a court construes all facts and evidence in the light most favorable to the

nonmovant. *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013). In response to another's

motion, the nonmovant cannot rely on "[c]onclusory allegations, speculation, unsubstantiated

assertions, and legalistic arguments." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754,

759 (5th Cir. 2002).

       Still, "[w]hen both parties have submitted evidence of contradictory facts," *Boudreaux v.

Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005), a court is bound to "draw all

reasonable inferences in favor of the nonmoving party," *Reeves v. Sanderson Plumping Prods.*,

530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000); *see also Anderson*, 477 U.S.

at 248 (emphasizing the irrelevance of "[a]ny proof or evidentiary requirements imposed by the

substantive law," materiality "not a criterion for evaluating the evidentiary underpinning of

[factual disputes]"). It thus cannot "make credibility determinations or weigh the evidence."

*Reeves*, 530 U.S. at 150. This command—that a district court "eschew making credibility

determination or weighing the evidence," *Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir.

2011) (citing *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)); *accord, e.g.*, *Flythe v.

Dist. of Columbia*, 791 F.3d 13, 22 (D.C. Cir. 2015)—applies so long as the record retains

patches of reasonable ambiguity that has not been artificially manufactured. *See, e.g.*, *Tolan v.

*Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) (per curiam) ("[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.").

So constrained, under Rule 56, this Court must "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." 9A CHARLES WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 2529 (2d ed. 1995). To wit, although this Court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151, *cited in Havera*, 723 F.3d at 591. Within the narrow ambit of Rule 56, summary judgment is hence inappropriate (1) if there are legitimate, not superficial or frivolous, factual disputes that may affect the outcome of the case under the applicable substantive law, *see Anderson*, 477 U.S. at 248, and (2) so long as the nonmovant does not exclusively rely on "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "a scintilla of evidence," *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

### 2.   *Substantive Law: Partnerships and Joint Ventures*

Article 2801 defines a "partnership" as a "juridical person, distinct from its partners, created by a contract between two or more persons to combine their efforts or resources in determined proportions and to collaborate at mutual risk for their common profit or commercial benefit." LA. CIV. CODE ANN. art. 2801; *see also St. Charles Land Trust v. J. O. St. Amant*, 217 So. 2d 375, 389 (La. 1968) ("A partnership is created by contract among the partners."); *Butler v. Sudderth*, 00-1950 (La. App. 5 Cir. 4/24/01); 784 So. 2d 125, 130 (citing Article 2801). For a

partnership to arise, "both parties intend to have a business relationship between them," and the resulting relationship must exhibit "all the major characteristics of a partnership" referenced in Article 2801. *Sacco v. Paxton*, 2012-1595 (La. App. 4 Cir. 1/30/14); 133 So. 3d 213, 217–18 (collecting cases). A specific manifestation of a general rule, a partnership may be formed pursuant to an oral agreement "if each of the required elements is present." *Norris v. Fontenot*, 03-1455 (La. App. 3 Cir. 3/3/04); 867 So. 2d 179, 183; *see also, e.g.*, *Zeising v. Shelton*, Civ. No. 12-2614, 2014 U.S. Dist. LEXIS 98148, at *12–15, 2014 WL 3571276, at *4 (W.D. La. July 18, 2014) (deriving three factors from Article 2801 and, while "considering the issue of profit and loss sharing to be disputed among the parties," finding no partnership could have arisen due to plaintiffs' "fail[ure] to rebut the absence of the intent and community of goods factors").

For all this ostensible clarity, ambiguities abound in application. Per Article 1846, if a contract's value "is in excess of five hundred dollars," the existence of an oral contract "must be proved by at least one witness and other corroborating circumstances." LA. CIV. CODE ANN. art. 1846; *Samuels v. Firestone Tire & Rubber Co.*, 342 So. 2d 661, 662 (La. 1977) (quoting *id.*). Just as clearly, "the party who is demanding performance of an obligation must prove the existence of the obligation" by a preponderance of the evidence. LA. CIV. CODE ANN. art. 1831; *Kilpatrick v. Kilpatrick*, 27,241 (La. App. 2 Cir. 8/23/95), 660 So. 2d 182, 185 ("*Kilpatrick*"). For purposes of this Article, a plaintiff himself or herself may serve as a witness, but the "other circumstances [that] corroborate the claim must come from a source other than the plaintiff." *Suire v. Lafayette City-Parish Consol. Gov't*, 04-1459 (La. 04/12/05); 907 So. 2d 37, 58; *accord First Bank & Trust v. Treme*, 13-168 (La. App. 5 Cir. 10/30/13), 129 So. 3d 605, 612. Still, such "corroborating circumstances need only be general in nature; independent proof of every detail of the agreement is not required." *Suire*, 907 So. 2d at 58 (relying on *Kilpatrick*); *accord Nola*

*Fine Art, Inc. v. Ducks Unlimited, Inc.*, 88 F. Supp. 3d 602, 608 (E.D. La. 2015). In addition, as Article 2801's final words make clear, an association directed at the attainment of "common profit *or* commercial benefit" may be classified as a partnership. LA. CIV. CODE ANN. art. 2801 (emphasis added). Textually, therefore, an absence of "common profit" cannot prove singularly dispositive so long as some shared "commercial benefit" is sought by means of a partnered effort. *See, e.g.*, *State v. Clark*, 12-1296 (La. 5/7/12); 117 So. 3d 1246, 1250 ("Statutory interpretation begins with the language of the statute itself." (internal quotation marks omitted)); BRYAN A. GARNER & ANTONIN SCALIA, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 116–19 (2012) (discussing the conjunctive/disjunctive canon). This oft-overlooked aspect of partnership law finds support in one more article: while "Louisiana partnership law provides that each partner participates equally in profits, commercial benefits and losses of the partnership," partners may always "agree[] otherwise." LA. CIV. CODE ANN. art. 2803; *Dhaliwal v. Dhaliwal*, 48,034 (La. App. 2 Cir. 9/11/13); 124 So. 3d 470, 480.

Although Louisiana lacks any statutory law governing joint ventures, "cases have generally assimilated joint venture to th[is] law of partnership." *Florida Universal Fin. Corp. v. Cox*, 493 So. 2d 710, 713 (La. Ct. App. 1986). Consequently, "the essential elements of a joint venture and a partnership are the same," and joint ventures are "generally governed by partnership law." *Broadmoor, L.L.C. v. Ernest N. Morial New Orleans Exhibition Hall Auth.*, 04-0211 (La. 3/18/04); 867 So. 2d 651, 663; *accord, e.g.*, *Tedeton v. Tedeton*, 46,901 (La. 2/8/12), 87 So.3d 914, 924; *Joyner v. Liprie*, 44,852 (La. App. 2 Cir. 1/29/10); 33 So. 3d 242, 251; *Riddle v. Simmons*, 40,000 (La. App. 2 Cir. 2/16/06), 922 So. 2d 1267, 1281. For decades, Louisiana courts have looked to the same seven criteria, defining "a joint venture" or a "partnership" as: "(1) a contract between two or more persons; (2) [a] juridical entity or person is established; (3)

[c]ontribution by all parties of either efforts or resources; (4) [t]he contribution must be in determinate proportions; (5) [t]here must be joint effort; (6) [t]here must be a mutual risk vis-a-vis losses; [and] (7) [t]here must be a sharing of profits. *Cajun Elec. Power Coop., Inc. v. McNamara*, 452 So. 2d 212, 215 (La. Ct. App. 1984) ("*Cajun*"); *see also, e.g.*, *Garber v. Badon & Ranier*, 07-1497 (La. App. 3 Cir. 3/2/08); 981 So. 2d 92, 103 (citing *id.*); *Moroux v. Toce*, 06-831 (La. App. 3 Cir. 11/2/06); 943 So. 2d 1263, 1271 (same).

 As this identity of terms suggests, the same general precepts govern. Hence, a joint venture is spawned only "where the parties intend . . . [such a] relationship to exist," and its existence is "predicated upon contract either express or implied." *Price Farms, Inc. v. McCurdy*, 45,409 (La. App. 2 Cir. 7/7/10); 42 So. 3d 1099, 1107 n.2 (citing, among others, *Broadmoor, L.L.C.*, 867 So. 2d at 651); *accord, e.g.*, *Smith v. Lonzo*, 2002-1053 (La. App. 3 Cir. 2/5/03); 838 So. 2d 918, 921 (citing, among others, *Pillsbury Mills, Inc. v. Chehardy*, 90 So. 2d 797, 801 (La. 1956)). As a result, "[n]o formal or specific agreement is required." *Riddle v. Simmons*, 589 So. 2d 89, 92 (La. Ct. App. 1991). Rather, a joint venture's reality may be "inferred from the conduct of the parties and other circumstance[s]" in the same manner as any oral contract's terms are confirmed, i.e. a plaintiff's own words and other "general" yet "corroborating circumstances." *Glass v. Berkshire Dev*., 612 So. 2d 749, 751 (La. Ct. App. 1992) (citing to *Riddle*, 589 So. 2d at 92); *accord First Bank & Trust*, 129 So. 3d at 613 (Wicker, J., concurring). Frequently, if not invariably, such a circumstantial analysis looks to "the usage[s] and practices characteristic of the particular commercial undertaking sought to be labeled a joint venture." *Palmer v. Vermillion Homes Builders*, 48,838 (La. App. 2 Cir. 2/26/14); 134 So. 3d 1248, 1254. Nonetheless, the Parties' chosen terminology will never control. *Smith v. Scott*, 26,849 (La. App. 2 Cir. 05/10/95); 655 So. 2d 582, 584. Instead, precise factual findings are necessary, *Tabco Exploration, Inc. v.*

*Tadlock Pipe & Equip., Inc.*, 617 So. 2d 606, 609 (La. Ct. App. 1993.), *writ denied*, 625 So. 2d 1057 (La. 1993), and the "existence and nonexistence of a joint venture," like a partnership, has always been a "question of fact" under Louisiana law. *Curtis v. Curtis*, 07-392 (La. App. 3 Cir. 11/7/07); 969 So. 2d 1277, 1281 (quoting *Coffee Bay Investors, L.L.C. v. W.O.G.C. Co.,* 03-406 (La. App. 1 Cir. 4/2/04); 878 So. 2d 665, 670)); *Grand Isle Campsites, Inc. v. Cheek*, 262 So. 2d 350, 357 (La. 1972); *cf.* Curtis Bridgeman, *Why Contracts Scholars Should Read Legal Philosophy: Positivism, Formalism, and the Specification of Rules in Contract Law*, 29 CARDOZO L. REV. 1443, 1477 (2008) (observing that questions of fact are normally reserved for juries in contracts cases). Finally, as between partners, "[a] fiduciary obligation is imposed on all participants of loyalty and the utmost good faith, fairness and honestly in their dealings." *Joyner*, 33 So. 3d at 252 (collecting cases); *accord Garber*, 981 So. 2d at 103 (quoting *Moroux,* 943 So. 2d at 1271). "Generally," then, but not exclusively, determination of the actuality of partnerships and joint ventures involves an identical analytical approach. *Broadmoor,* 867 So. 2d at 663; *see also Smith*, 655 So. 2d at 584 (affirming the trial court's finding "that a partnership existed rather than a joint venture").

But these similarities obscure at least three key differences. First, despite the repeated reference to the same seven elements pioneered in *Cajun*, *see, e.g.*, *Guilbeaux v. Times of Acadiana*, 96-360 (La. App. 3 Cir. 3/26/97); 693 So. 2d 1183, 1188, not all seven must be demonstrated for a joint venture to be established. Instead, courts "look to the totality of evidence," *Cajun*, 452 So. 2d at 215, and have steadfastly rejected "hard and fast rules," *Sacco*, 133 So. 3d at 221. As an example, "the agreement of the parties to divide profits may be sufficient to stamp the undertaking a joint venture" even in the absence of "an express agreement to share in losses." *Johnco, Inc. v. Jameson Interests*, 98-1925 (La. App. 3 Cir. 6/23/99); 741 So.

2d 867, 871. Second, even as an agreement to share profits constitutes a key factor, Article 2801 and a handful of joint venture cases indicate that "mutual risk" assumed for the sake of a "commercial benefit" may also suffice. LA. CIV. CODE ANN. art. 2801; *see, e.g.*, *Wells v. St. Augustine High Sch. Inc.*, 2014-0234 (La. App. 4 Cir. 9/3/14); 150 So. 3d 1, 7 (citing *Broadmoor*, 867 So. 2d at 663). Third, for all the courts' repeated emphasis on the same factors, the relevant jurisprudence evidences a striking inconsistency in their application. *See generally* Robert Flannigan, *The Joint Venture Fable*, 50 AM. J. LEG. HIST. 201 (2008-10); *see also, e.g.*, Guy E. Wall, *Joint Oil and Gas Operations in Louisiana*, 53 LA. L. REV. 79, 97 (1992) ("No satisfactory distinction between partnership and joint venture has been developed."); Blake West, Comment, *The Business Joint Venture in Louisiana*, 25 TUL. L. REV. 382, 387–88 (1951) (emphasizing that neither "an agreement to share profits" nor one to "share losses" is essential, as either obligation may be modified by the parties or implied by the courts). With so much ambiguity extant, the term "joint venture" is still "easier to define than to identify." Joseph Taubman, *What Constitutes a Joint Venture*, 41 CORNELL L. REV. 641, 642 (1956); *see also Colonial Refrigerated Transp., Inc. v. Mitchell*, 403 F.2d 541, 546 (5th Cir. 1968) (citing *id.* and tracing the doctrine's American history).

3.    *Substantive Law: Articles 1759 and 2024*

Two more Articles bear on the construction of the Parties' oral contract.

First, axiomatically, "[i]nterpretation of a contract is the determination of the common intent of the parties." LA. CIVIL CODE ANN. art. 2045. Usually an "objective inquiry," *Latino v. Jones*, 91 So. 3d 335, 338 (La. Ct. App. 2012), "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of

the parties' intent," LA. CIVIL CODE art. 2046. However, the Civil Code concurrently implies a covenant of good faith and fair dealing into every contract. LA. CIV. CODE art. 1983; *see, e.g.*, *Guidry v. E. Coast Hockey League, Inc.*, 2002-1254 (La. App. 3 Cir. 3/5/03); 844 So. 2d 100, 105; *Grisaffi v. Dillard Dep't Stores, Inc.*, 43 F.3d 982, 983 (5th Cir. 1995); *Brill v. Catfish Shaks of Am., Inc.*, 727 F. Supp. 1035, 1039 (E.D. La. 1989). Article 1759 extends this principle to the law of obligations, affirming: "Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation." LA. CIV. CODE ANN. art. 1759. The comment to Article 1770, also references the good faith obligation, specifically discussing the requirement of good faith in the context of termination of at-will contracts: "In order to comply with the requirement of good faith, a party exercising his right to terminate a contract at will should consider . . . the hardship to which the other party will be subjected because of the termination." LA. CIV. CODE ANN. art. 1770, cmt. (f), *quoted in Volentine v. Raeford Farms of La., L.L.C.*, 48,219 (La. App. 2 Cir. 7/24/13); 121 So.3d 742, 745. Traditionally, "bad faith" connotes an action motivated by some "ill will" or the "conscious doing of a wrong for dishonest or morally questionable motives." *Fertel v. Brooks*, 2002-0846 (La. App. 4 Cir. 9/25/02); 832 So.2d 297, 306 n.12.

Second, "[a] contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party." LA. CIVIL CODE ANN. art. 2024. Consequently, "[i]f reasonable notice is not given, then the existing contract remains in force and continues to govern the parties' relationship." *Stegall v. Orr Motors of Little Rock, Inc.*, 48,241 (La. App. 2 Cir. 6/26/13); 121 So. 3d 684, 389. Unsurprisingly, the outer bounds of reasonableness are determined by reference to the overriding duty of good faith specified in Article 1759. *Ferrara Fire Apparatus, Inc. v. JLG Indus.*, Civ. No. 08-285-C-M2, 2009 U.S.

Dist. LEXIS 125576, at *36, 2010 WL 775162, at *7 (M.D La. Dec. 21, 2009). Furthermore, "[b]ecause duration refers to the term of the contract," Article 2024 must "be read *in pari materia* with provisions regarding the term of obligations." *Caddo Gas Gathering, L.L.C. v. Regency Intrastate Gas LLC*, 44,851 (La. App. 2 Cir. 11/12/09); 26 So. 3d 233, 236. In accordance with this rule, Article 2024 has been consistently construed in conjunction with Article 1778 and been held to apply only if a contract's duration is "uncertain *and* undeterminable," *Schultz v. Hill*, 2002-0835 (La. App. 1 Cir. 2/14/03); 840 So. 2d 641, 645 (emphasis added), as Defendant itself acknowledges, (Doc. 55-4 at 9).

**B.     Application**

*1.     Minimal Sufficiency of the Existing Evidence under Rule 56*

For two reasons, and at least partly due to the oral nature of the Parties' contract, Rule 56 compels denial of Defendant's Partial MSJ. *Cf., e.g.*, James H. Stilwel, *When Actions Speak Louder than Words: The Case for a Quasi-Estoppel Exception to the Statute of Frauds*, 22 REV. LITIG. 69, 70 (2003) ("Good advice for the congenial entrepreneur or consultant is to 'get it in writing.'"); Scott J. Burnham, *The Parol Evidence Rule: Don't Be Afraid of the Dark*, 55 MONT. L. REV. 93, 103 (1994) (commenting that "[o]ral contracts may present problems of proof"); David A. Sonenshein, *State of Mind and Credibility in the Summary Judgment Context: A Better Approach*, 78 NW. U. L. REV. 774, 806 (1983–84) (observing that in actions on oral contracts "interested testimony is generally essential to proving a claim").

First, a modicum of evidence does exist to support Plaintiffs' characterization of the Parties' relationship as a joint venture. In essence, Defendant lodges three objections to this

theory, deeming it "vaguely alleged," overlooking its long-recognized contractual character,[9] and

discerning an absence of "any evidence" for Plaintiffs' claims. (Doc. 55-4 at 13.) In actuality,

however, enough facts have both been alleged and not conclusively disproven to allow a rational

factfinder to discern such the creation in 2011 of this long-recognized and firmly established

contractual relationship, Plaintiffs' assertions neither impossibly opaque nor wholly fanciful.

Some of these crucial allegations, of course, come from Riddle himself. In his words,

wanting to "control" his "own destiny" and "tired" of being merely a "rep[resentative]" of

another entity, Riddle met with McCuddy in "January 2011 or February 2011." (Doc. 59-2 at

28.) During this conference, McCuddy allegedly said, "Let's do it together," and the natural

principals purportedly made use of the term "partnership" and "joint venture" throughout the

course of their association. (Doc. 59-2 at 29–30, 31, 32, 35; Doc. 59-3 at 12, 33.) Amidst the

"totality of evidence" that the Court must consider, *Cajun*, 452 So.2d at 215, here there is more

than the scintilla of support for Plaintiffs' allegations required by Rule 56.

While these representations come from Plaintiffs alone, the kind of "general"

corroboration that Louisiana cases just as surely mandate, *Suire*, 907 So. 2d at 58, can be

reasonably discerned in and gleaned from others' testimony. For instance, in response to a

dealer's email, McCuddy wrote, "I am very happy to have partnered up with . . . [Chris Riddle],"

and waxed about the "great team at Forest River Marine." (Doc. 59-2 at 89–90.) Under oath, he

---

[9] In a revealing sentence, Defendant writes: "They do not make clear whether this allegation [of a joint venture] is related to their breach of contract claims or is another theory of recovery." (Doc. 55-4 at 13.) As a joint venture is "predicated upon contract either express or implied," *Price Farms, Inc.*, 42 So. 3d at 1107 n.2, Plaintiffs' contention that Defendant acted in contravention of a contract establishing such an association is both "[a] breach of contract claim[]" and "[a] theory of recovery."

described the Parties' association as "a joint combined effort of individuals."[10] (Doc. 59-3 at 39.) To this depiction, McCuddy repeatedly returned: "[I]t was a team effort"; "[I]t was a total team concept"; and "It was a team effort." (*Id.* at 40, 44.) Yes, no documents survive using this weighty term; seemingly, none were ever penned and signed. (Doc. 59 at 3; *see also, e.g.*, Doc. 59-3 at 16, 24.) However, as case after case declares, no written documentation is necessary for a joint venture to arise, and oral statements that reasonably suggest the striking of a contract so intended may suffice to create it. *See, e.g.*, *Price Farms, Inc.*, 42 So. 3d at 1107 n.2. Indeed, with this Court required to interpret any ambiguity in the nonmovants' favor, it is rather telling that, while McCuddy denies "aware[ness] of any Forest River *documents* which use the term joint venture," he here pleads no more than a lack of knowledge and does not actually deny orally making statements that could be so reasonably construed. (Doc. 55-3 ¶ 7 at 2 (emphasis added).) In sum, while Defendants seemingly demands "independent proof of every detail of the agreement," the relevant substantive law really requires no more than some overall corroborations from "someone other than the party asserting the agreement's existence." *Suire*, 907 So. 2d at 58; *Deubler Elec. Inc. v. Knockers of La., Inc.*, 95-372 (La. App. 5 Cir. 11/15/95); 665 So. 2d 481, 484; *see also Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1020 (10th Cir. 2006) (citing both *Suire* and *Deubler*). Considered in light of Plaintiffs' own assertions, McCuddy's ambiguous admissions both offer the corroboration vital under Louisiana law and help Plaintiffs pass Rule 56's minimum, a conclusion cinched by the general rule that "[w]hether

---

[10] Defendant highlights this point in arguing that no joint venture between Xcursion and Forest River ever existed. This notion, however, is nothing but a red herring, for so long as the joint venture linked Riddle, Payne, and Forest River, it is utterly irrelevant whether Xcursion was initially involved or created afterward as an extension of Riddle and Payne. Just as importantly, this contention ignores the fact that every check sent by Defendant was addressed to Xcursion, so that, in effect, Defendant considered Xcursion to be a participant in the Parties' association upon and after  its incorporation. (Doc. 1-2 at 12, 14, 16, 18, 20, 22, 29, 31.)

there . . . [are] corroborating circumstances sufficient to establish an oral contract is a question of fact," *Pennington Constr. v. R A Eagle Corp.*, 94 0575 (La. App. 1 Cir. 3/3/95); 652 So. 2d 637, 640 (citing to *Pelican Elec. Contractors v. Neumeyer,* 419 So. 2d 1 (La. Ct. App. 1982))).

     Significantly, not just his words but McCuddy's emails suggest that Defendant treated Riddle and Payne (and, by extension, Xcursion) as more than salesmen. Thus, throughout the Parties' association, he and others at Forest River consulted Riddle on the content of brochures and asked for his approval on various design changes to Xcursion-branded pontoons. (Doc. 59-2 at 92–122; *see also* Doc. 59-3 at 28, 60, 65.) Once more, others bear this out, (*See, e.g.*, Doc. 59-3 at 60, 65, 68, 70), as does McCuddy's own continued testimony: "[I]t was a team effort and there were communications between numerous people relative to the designs and numerous conversations," (*id.* at 40), a description that he reiterated moments later, (*id.* at 44). While he would eventually characterize Xcursion as merely "a sales organization to handle the sales of Xcursion pontoons for a commission rate" during his deposition, (*id.* at 46), such a statement cannot override the import of his earlier admissions that the Individual Plaintiffs did far more than manage sales in the course of the Parties "joint combined effort," (*id.* at 39). From Mr. Guy Michael Vidmar, Jr. ("Vidmar"), "the Administrative Manager with Forest River" in March 2015, further confirmation comes about the Individual Plaintiffs' role, Vidmar acknowledging that Payne, Riddle, McCuddy, and others regularly "discussed building a new pontoon line." (*Id.* at 57.) Its intended meaning not yet probed or clarified, such language could be reasonably construed as proof that Riddle and Payne did not leave McCuddy's office as Forest River's mere agents but rather departed and subsequently acted as participants in the joint production and marketing of a new pontoon line, as Vidmar's later testimony only more clearly implies (and could be reasonably interpreted): "Wendell wanted Forest River to build him a new pontoon

brand that he could not only sell at his . . . dealership . . . but also something that he could possibly take by hiring other sales reps . . . nationally." (*Id.* at 58.) The evidence, then, leaves open the reasonable possibility of a jury finding that a joint venture arose as a matter of fact and as effectively envisioned by the Parties, even if it was never so consciously named and formalized. *Cf. Cajun*, 452 So. 2d at 216 (emphasizing that plaintiff has "overlook[ed] the obvious that the legal relationship of parties will not be conclusively controlled by the terms which the parties use to designate their relationship"). As McCuddy says, "[t]he group, the team" of Riddle, Payne, and Forest River designed and marketed the Xcursion line, (*id.* at 46), testimony sufficient to allow another to infer the existence of a joint venture and not a simple agency.[11]

Second, Defendant overemphasizes the import of this contract's "unspecified" duration when it argues that an absence of a definite temporal term triggered application of Article 2024. (Doc. 55-4 at 11–13.) While Article 2024 allows termination of contracts with "uncertain and undeterminable" terms upon "reasonable notice," LA. CIV. CODE ANN. art. 2024, it does not apply where an uncertain term is nonetheless determinable by reference to the happening of a future event, *Schultz*, 840 So. 2d at 645. This principle holds "even though the date of the happening of that future event cannot be known until its occurrence." *Id.* As another court explained, "[c]ontracts may be uncertain as to point of time when they will terminate, so long as there is no uncertainty as to the event which will bring about their termination." *State ex rel. Guste v. Orkin Exterminating Co.*, 528 So. 2d 198, 201 (La. Ct. App. 1988); *cf. Daily States*

---

[11] For this very reason, *Read* is inapposite. In *Read*, no evidence emerged at trial, besides the plaintiff's own words, to support a meeting of the minds regarding a five-year employment contract. *Read*, 165 So. 3d at 888. Here, McCuddy's testimony can still be reasonably construed in Plaintiffs' favor. Furthermore, an entire record, like the one that the Supreme Court of Louisiana diligently explored in *Read*, does not yet exist here.

*Publ'g Co. v. Uhalt*, 126 So. 228, 231 (La. 1930) ("If no date is fixed by the contract for the termination of the [joint venture or other association] . . . , or its termination is dependent upon the happening of a contingency, the agreement is usually constituted to remain in force until the purpose is accomplished, or the contingency has happened, and neither party can, without just cause, terminate the adventure until that time."). Case law offers up a telling example: "A contract for the lifetime of the structure is for a definite and ascertainable period." *Guste*, 528 So. 2d at 201.

Here, a similarly ascertainable period can be implied from the circumstances—the lifetime of Forest River's production of the Xcursion—and finds support in Payne's and McCuddy's depositions. (Doc. 59 at 10–11.) Revealingly, although the Partial MSJ contends that "Forest River's standard practice is to have its sales contracts run on a year-to-year basis," (Doc. 55-4 at 4; *see also* Doc. 55-3 ¶ 7 at 2), McCuddy's own testimony suggests Forest River did not view the contract as a yearly one: asked, "[T]he thinking was it would be longer term?" he answered, "Yes," Forest River having "gone into the deal thinking it would be a longer term situation [than 'only a year']."(Doc. 59-3 at 48, 47.). In this context, particularly in light of McCuddy's sworn admission, Defendant's usual practice with its usual vendors and agents is irrelevant, for McCuddy's testimony permits a "certain" term to be reasonably imputed into these specific Parties' silent contract.[12] Similarly, the fact that Plaintiffs never conveyed their impression to Defendants or saw the contract as "perpetual" has no decisive bearing, for a

---

[12] In actuality, one more admission by Defendant undercuts the cogency of its reliance on its prior custom. According to the Partial MSJ, prior to the contract's termination, Defendant sought to convince Plaintiffs to "enter[] into a differently structured contract consistent with lower commissions paid to other salesmen." (Doc. 55-4 at 5.) Per this admission, then, Defendant has thus conceded that its contract with Plaintiffs was unique. As such, its prior practice cannot provide an unerring guide to the classification of an enterprise that it has impliedly branded uncommon.

definite duration can still be conjectured based on the uncontested facts. Because a factfinder

could do so, this Court will not find the agreement to be both uncertain and indeterminable as to

duration as a matter of law, and thus Article 2024 is irrelevant at this point in time,[13] *see* LA.

CIVIL CODE ANN. art. 2024.

Notably, in so concluding, this Court merely aligns itself with Louisiana precedent's

overwhelming tenor. For Louisiana courts, even if a contract's ambiguity is question of law and

even though the elements of a joint venture are well-known, the existence or nonexistence of a

joint venture is a question of fact. *See, e.g.*, *Shepherd v. Jay*, 508 So. 2d 650, 652 (La. Ct. App.

1987) (citing *Cajun*, 452 So. 2d 212). Accordingly, summary judgment cannot be granted as to

the existence (or not) of this kind of relationship when the evidence presented is subject to

"conflicting interpretations" and requires "credibility determination." *Dhaliwal*, 124 So. 3d at

481. Here, considering the ambiguities created by McCuddy's and Vidmar's testimony and

emails, as well as the Individual Plaintiffs' equally certain averments, evaluations of credibility

and inferences of fact must be drawn for this Court to conclude no joint venture arose or that

Defendant's termination fully complied with Louisiana law, including Articles 2024 and 1983.

As such, regardless of how reasonable Defendant's evaluation of the evidence may appear to be,

Rule 56 compels this Court to leave such determinations to the proper factfinder: a jury of the

Parties' peers, soon to be empaneled. *See, e.g.*, *Reeves*, 530 U.S. at 151; *Smith*, 655 So. 2d at

584.

---

[13] Another factual issue has been overlooked by both Parties: whether the notice given was "reasonable," as Louisiana law requires. Defendant says no more than that it gave "proper notice." (Doc. 55-4 at 2.) It does not aver that it provided notice consistent with the good faith principle embedded in Article 1983. Of course, "judicial determination of good-faith (or bad-faith) failure to perform a conventional obligation is always preceded by a finding that there was a failure to perform, or a breach of the contract." *Favrot v. Favrot*, 2010 0986 (La. App. 4 Cir. 2/9/11); 68 So. 2d 1099, 1110. To determine this, therefore, the exact nature of the Parties' oral contract, still indeterminate, must first be ascertained.

**2.      *Discounting Defendant's Arguments***

Even some some evidence can be found for Plaintiffs to survive Rule 56's scrutiny, Defendant's affirmative trio of reasons cannot withstand the intense scrutiny that Rule 56 compels.

First, no written joint venture agreement is necessary, *see, e.g.*, *Broadmoor, L.L.C.*, 867 So. 2d at 651, as Defendant believes, (Doc. 55-4 at 2). Plaintiffs may yet fail to establish the elements of a joint venture, as occurred in *Read*. However, because "the relationship may be formed by an oral agreement and the existence of a joint venture may be inferred from the conduct of the parties and other circumstances," *Dhaliwal*, 124 So. 3d at 480, only the absence of any ambiguous evidence possible to reasonably construe in Plaintiffs' favor would permit this Court to presently dismiss this proceeding. The record, as it is now constituted, is not so bare.

Second, an agreement on losses has never been singularly dispositive in disproving a joint venture's emergence. *See Johnco, Inc.*, 741 So. 2d at 871, though Defendant believes it so, (Doc. 55-4 at 2; *see also* Doc. 65 at 4–5). In fact, "losses" are broadly defined within this jurisprudence, as including "time expenditures and out of pocket expenses, especially where one party to the venture furnishes property and the other only services." *Id.*; *see also Latiolais*, 567 So. 2d at 1161. Here, Plaintiffs have pointed to such "losses," alleging expenses such as "time and labor, travel expenses, acquisition of websites, creation of promotional brochures and marketing material, wining and dining dealers, and reimbursing freight." (Doc. 59 at 20.) Defendant, moreover, does not dispute the allegation that Payne and Riddle did "venture" something: the Xcursion design, whether independently or after a "team" consultation with McCuddy. (Doc. 59-3 at 38–39.)

Finally, Defendant's strongest argument against Plaintiffs' joint-venture notion rests upon the absence of a clear-cut agreement to share profits, but even the absence of this element cannot outweigh the other six. *Cf. Barnett v. Globe Indem. Co.*, 557 So. 2d 300, 301 (La. Ct. App. 1990) ("[T]he existence of a joint venture is a question of fact and each case must be considered *sui generis*."). Such a task would require rewriting Article 2801, LA. CIV. CODE ANN. art. 2801, and no judge may engage in such a forbidden interpretive tactic, *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, -- F. Supp. 3d --, No. 15-cv-00565-JWD-SCR, 2015 U.S. Dist. LEXIS 146988, at *85, 2015 WL 6551836, at *26 (M.D. La. Oct. 29, 2015) (emphasizing that it is the judiciary's duty "to ascertain—neither to add nor to subtract, neither to delete nor to distort a[] . . .  [law's] . . . terms" (internal quotation marks omitted)). Indeed, as such cases make clear, those seven attributes amount to a general outline, not a complete test in which a single factor's absence makes the finding of a joint venture a factual impossibility. *Cajun*, 452 So. 2d at 216 ("There are no hard and fast legal rules fixing the requisites for a joint adventure [or 'venture'.]"). *But see Palmer*, 134 So. 3d at 1254 ("There must be a sharing of the profits and losses with each party having some right of control over the business.").

Perhaps more significantly, for all the prominence accorded to this one element in the case law, Article 2801 explicitly recognizes that a joint venture may be directed towards the achievement of some joint "commercial benefit" rather than simply profit. *See, e.g.*, *Wells*, 150 So. 3d at 7 (citing *Broadmoor*, 867 So. 2d at 663). For instance, an alleged agreement that conferred a mutual "commercial benefit" rather than endeavored to attain a "common profit" has once before created a joint venture. *Scheffler v. Adams & Reese LLP*, 06-1774 (La. 2/22/07); 950 So. 2d 641, 649 n.2. Since both Defendant and Plaintiffs sought to maximize the sales of the Xcursion line, (*See, e.g.*, Doc. 59 at 21), a joint commercial goal can be reasonably assumed,

with the Plaintiffs' unusually high "commissions" serving as a reasonable proxy for their share of the Xcursion line's financial success. *See, e.g.*, *Censor v. ASC Techs. of Conn., LLC*, 900 F. Supp. 2d 181, 189–90 (D. Conn. 2012) (describing a joint venture in which "profits" were shared by means of a monthly commission); *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 175 (S.D.N.Y. 2004) (finding no joint venture but conceding that commissions paid could be classified as "profits"); *Thorson v. Bellamy*, 635 P.2d 1048, 1053 (Or. Ct. App. 1981) ("[W]here evidence is contradictory and an agreement as to how the profits should be split cannot be affirmatively found, we hold that the trial court may rely upon the *prima facie* inference unless that inference is rebutted by the contesting party."). Regardless of this theory's actual veracity, it is not unreasonable based on the evidence so far presented.

In the end, Defendant's three attacks on Plaintiffs' joint venture theory must fail due to the high standard for dismissal set forth in Rule 56.


## IV.    CONCLUSION

Under Rule 56, no court may grant summary judgment if the evidence is conflicting or ambiguous and subject to multiple reasonable interpretations. While the meaning of a written contract is often well-suited for summary judgment, the ascertainment of an oral agreement's precise terms often rides on witnesses' credibility. Unable to consult a written text, a court and a jury must frequently infer particulars from contested memories and invariably subjective accounts. Thus, short of an unambiguous and patent record, Rule 56, as commonly construed, can rarely be invoked to divine such verbal agreement's terms and meaning.

In this proceeding, such a scenario confronts this Court. So far, Plaintiffs have provided more than unsubstantiated and conclusory assertions and a modicum of evidence to support the

existence of a joint venture. With some evidence having been adduced to support the existence of

such a venture, this Court must heed an admonition oft-repeated: "[T]he existence of a joint

venture is a question of fact and each case must be considered *sui generis*," *Barnett*, 557 So. 2d

at 301. By legal custom and by procedural law, such questions are better left to a jury's

resolution.

     For the foregoing reasons, this Court **DENIES** the Defendant's **Motion for Partial**

**Summary Judgment**, (Doc. 55).

     Signed in Baton Rouge, Louisiana, on <u>November 12, 2015</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**